IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DARRELL SUMLIN, #127 092,        )
    Sumlin,                    )
                                )
      v.                     )   CIVIL ACTION NO.:  2:14-CV-640-WKW
                                )                [WO]
DOCTOR DERJERLYN COPELAND,       )
                                )
    Defendant.                 )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

This matter is before the court on a 42 U.S.C. § 1983 damages action filed by Plaintiff

Darrell Sumlin, a state inmate incarcerated at the Elmore Correctional Facility in Elmore,

Alabama.  Sumlin alleges that Defendant Dr. Derjerlyn Copeland violated his Eighth Amendment

rights by failing to provide him with timely and adequate medical care on July 5, 2012, during his

previous incarceration at the Staton Correctional Facility ("Staton"). Doc. 1.

Dr. Copeland filed a written report, supplemental written report, and supporting evidentiary

materials addressing Sumlin's claims for relief. Docs. 11 & 24.  In her written reports, Dr.

Copeland denies she acted in violation of Sumlin's constitutional rights.  The court granted Sumlin

an opportunity to file a response to Dr. Copeland's reports and he has done so. Docs. 17, 20–22 &

26.[1]   The court deems it appropriate to treat Dr. Copeland's written report, as supplemented, as a

---

[1] In his responses, Sumlin addressed, among other issues, the exhaustion defense raised by Dr. Copeland.
He maintains that he did file a grievance addressing the treatment received from Dr. Copeland on March
19, 2013. Doc. 17-1 at 1; Doc. 17-3 at 2.  Dr. Copeland disputes this allegation and submits an affidavit
from the Health Services Administrator at Staton, who maintains that not only did the medical staff never
receive the grievance form offered by Sumlin, but also that Sumlin's form is forged. Doc. 24-1 at 1–3.  Dr.
Copeland further contends, however, that the court need not address the authenticity of the grievance form
because it only constitutes the initial step in the grievance process and Sumlin fails to present evidence that
he exhausted the available administrative remedy by submitting a grievance appeal. Doc. 24 at 4–5.
Regarding the latter argument, Sumlin contends that the response to his grievance—indicating that Dr.
Copeland no longer worked at Staton and his grievance could not, therefore, be processed—constitutes

motion for summary judgment. *See* Doc. 12.  This case is now pending on this dispositive motion.

## I.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing the nonmoving party has failed to present evidence to support some element on which it bears the ultimate burden of proof. *Id*. at 322–24.

Dr. Copeland has met her evidentiary burden. Thus, the burden shifts to Sumlin to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995) (holding that, once the moving party meets its burden, "the non-moving party must then go

---

exhaustion because the response effectively indicated that his grievance could not be addressed. Doc. 26 at 2.  In light of the foregoing, the court addresses the merits of the claim presented by Sumlin against Dr. Copeland. *See Ross v. Blake*, 136. S.Ct. 1850, 1859–60 (2016) (discussing the circumstances in which an administrative remedy, although existent, is not capable of use to obtain relief).

beyond the pleadings, and by its own affidavits [or sworn statements], or by depositions, answers

to interrogatories, and admissions on file," demonstrate there is a genuine dispute of material fact)

(internal quotations omitted).  This court will also consider "specific facts" pled in a plaintiff's

sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI

Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014).  A genuine dispute of material fact exists when

the nonmoving party produces evidence that would allow a reasonable factfinder to return a verdict

in its favor. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Public Educ.*, 495 F.3d 1306, 1313 (11th

Cir. 2007).

Although factual inferences must be viewed in a light most favorable to the nonmoving

party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does

not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *See

Beard v. Banks*, 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).

Sumlin's *pro se* status does not compel this court to disregard elementary principles of production

and proof in a civil case.

## II. DISCUSSION

While attending trade school on the morning of July 5, 2012, Sumlin experienced weakness

on the left side of his body.  Sumlin's instructor arranged for him to be returned to Staton, and

once there he was taken to the health care unit.  Sumlin informed medical personnel that his left

side was numb, that he believed he was having a mini-stroke, and that he needed to be taken to a

free-world hospital.  Dr. Copeland was in an adjacent room and overheard Sumlin's comments,

but she had not seen or examined him.  Dr. Copeland informed Sumlin that he did not know what

he was talking about and that she, as the physician, would make the call as to whether he needed

to be transported to a free-world hospital.  Dr. Copeland directed a nurse to place Sumlin in a

holding cell where she would seem him within a couple of minutes.  The nurse returned twenty

minutes later and asked how Sumlin was doing.  He informed her he was feeling weaker and

weaker and needed to see the doctor.  The nurse took Sumlin's blood pressure, which was elevated

according to Sumlin.[2]  She told Sumlin that she would notify Dr. Copeland of the blood pressure

reading as well as Sumlin's belief that he was experiencing a stroke.  Later, a correctional officer

walked past the holding cell and told Sumlin that Dr. Copeland was eating lunch.  Sumlin requested

that the guard call a supervisor because he had been waiting to see the doctor for two and a half

hours.  Sumlin then informed a nurse walking by his cell that he could not feel his right side.  The

nurse told Sumlin his face looked droopy.  Approximately 45 minutes later, two private security

guards arrived and transported Sumlin to Jackson Hospital in Montgomery, Alabama.  Sumlin

asserts that Dr. Copeland never examined him before he was transported to the hospital.  Sumlin

claims that he is now partially paralyzed on his left side. Doc. 1.

To prevail on an Eighth Amendment claim concerning an alleged denial of adequate

medical treatment, an inmate must—at a minimum—show that those responsible for providing

medical treatment acted with deliberate indifference to his serious medical needs. *Estelle v.

Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000); *McElligott

v. Foley*, 182 F.3d 1248, 1254–55 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th

Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986).  Specifically, correctional

officials or prison medical personnel may not subject inmates to "acts or omissions sufficiently

harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106;

*Mandel v. Doe*, 888 F.2d 783, 787 (11th Cir. 1989).

> In articulating the scope of inmates' right to be free from deliberate indifference,
> however, the Supreme Court has also emphasized that not every claim by a prisoner

---

[2] Sumlin's medical records show that his initial assessment by medical staff on July 5, 2012, reflected a
blood pressure reading of 132/100. Doc. 11-5 at 13.

> that he has not received adequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105; *Mandel*, 888 F.2d at 787.  Medical treatment violates the eighth amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *Rogers*, 792 F.2d at 1058 (citation omitted).  Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Mandel*, 888 F.2d at 787–88 (mere negligence or medical malpractice not sufficient to constitute deliberate indifference); *Waldrop*, 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference).  Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop*, 871 F.2d at 1033 (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (internal quotation marks omitted).

A correctional official or health care provider may be held liable under the Constitution for acting with deliberate indifference to an inmate's health when the official knows that the inmate faces "a substantial risk of serious harm" and nevertheless fails to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 836–37 (1994).  A constitutional violation occurs only when a plaintiff establishes the existence of "a substantial risk of serious harm, of which the official is subjectively aware, . . . and [that] the official does not respond[] reasonably to the risk" *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1028 (11th Cir. 2001) (internal quotation marks and citation omitted).  "Even assuming the existence of a serious risk of harm and legal causation, the [defendant] must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists—and the [defendant] must also draw that inference." *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (quotation marks and citation omitted).  Thus, in order to survive summary judgment on his claim, Sumlin is "required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendant[']s deliberate indifference to that risk; and (3) causation." *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995).

Dr. Copeland was the medical director and site physician at Staton from September 2010

to March 1, 2013, and was employed by Corizon, Inc., which holds the medical contract to provide

medical care and services to inmates in the custody of the Alabama Department of Corrections.

Dr. Copeland is familiar with Sumlin, having examined him and treated him at Staton.  Dr.

Copeland submitted her affidavit and Sumlin's relevant medical records in response to the

complaint.[3]  Those portions of Dr. Copeland's affidavit set forth herein are corroborated by the

objective medical records contemporaneously compiled during the treatment process.   She

addresses Sumlin's allegation of deliberate indifference, in pertinent part, as follows:

> 9.  The actual chronology of events on July 5, 2012, are set forth in Mr. Sumlin's
> medical records. At approximately 11:40 a.m. on July 5, 2012, Mr. Sumlin reported
> to the healthcare unit with complaints of heaviness on his left side. (COR012). At
> the time of his arrival in the Staton Health Care Unit, Mr. Sumlin reported to a
> member of the Staton nursing staff that he began "feeling numbness in my left arm
> and then [his] left leg" on the bus that morning while being transported to trade
> school. (COR012). Mr. Sumlin then reported he felt his entire left side of his body
> "go heavy for 5 minutes." (COR012). He then reported that "it was very hot inside
> [and] it went away when I went in air conditioning and drank water"; however, his
> symptoms returned "when he went outside." (COR012). Mr. Sumlin specifically
> denied any episode of "fainting, blurred vision [or] slurred speech" or "chest pain."
> (COR012). Mr. Sumlin also informed the nurse that the "DOC made me come" to
> the Health Care Unit for evaluation. (COR012). Upon physical examination, the
> nurse confirmed that Mr. Sumlin's gait was "steady." (COR012). After completing
> the physical examination, the nurse referred Mr. Sumlin to the nurse practitioner on
> staff for further evaluation. (COR012). It is important to note that, at the time of
> this initial nursing assessment, I was not notified of Mr. Sumlin's condition or his
> arrival at the Health Care Unit until after the initial assessment by the nurse
> practitioner, which is not unusual or atypical. If the nurse practitioner believed that
> Mr. Sumlin should be transported immediately to the local emergency room based
> upon his symptoms, the nurse practitioner possessed the authority to carry out this
> referral without my consent or permission.
>
> 10.  On July 5, 2012, the nurse practitioner and other members of the medical staff
> documented the exact course of events which led to the transportation of Mr.
> Sumlin to the local emergency room on July 5, 2012. At approximately 12:35 p.m.
> on July 5, 2012, the nurse practitioner began her evaluation of Mr. Sumlin.
> (COR198). As indicated in the notes from the nurse practitioner, Mr. Sumlin
> reported feeling numbness in his left side for the first time while being transported
> to trade school and again after his arrival at trade school. (COR198). Thereafter,

---

[3] Dr. Copeland cites to Sumlin's medical records throughout her affidavit.  The citations set forth in her
affidavit reference the page numbers assigned to these documents by the medical care provider.

Mr. Sumlin was transported back to the facility for evaluation and reported, upon his arrival, a "heavy sensation" to his left side and also reported for the first time to the nurse practitioner that his "speech is funny." (COR198). The nurse practitioner confirmed the absence of any headache or chest pain or other symptoms of any kind. While the nurse practitioner noted some slight facial asymmetry and a mild weakness to Mr. Sumlin's left side, she did not notice any other signs or symptoms which indicated that Mr. Sumlin was experiencing a stroke at that time. (COR198).

11.   During the initial examination, the nurse practitioner also conducted what is referred to as the Romberg's Test or Romberg Maneuver, which is a test utilized by clinicians as part of a neurological exam to test an individual's neurological and motor coordination. Other than a slight dragging of his left leg and some left side weakness, the nurse practitioner did not notice any other neurological deficits, which she discussed with me after completing the exam. At that time, I instructed the nurse practitioner, based on the results of the exam, to monitor Mr. Sumlin for a brief period of time before we made any final decision. (COR199).

12.   Within a few minutes after we completed our discussion and approximately 20 minutes after the nurse practitioner completed her evaluation of Mr. Sumlin, Mr. Sumlin reported that he was having increased heaviness and weakness in his left arm and that, unlike the prior examinations, he had developed difficulty walking without assistance. (COR199). The nurse practitioner immediately notified me of this development and I reported to Mr. Sumlin's bedside where I briefly evaluated him and instructed the medical staff to proceed with his transfer to the emergency room at Jackson Hospital for further evaluation. (COR199). The nursing staff immediately contacted the local ambulance service to complete the transfer of Mr. Sumlin. At 1:05 p.m., the nurse practitioner entered orders for Mr. Sumlin to be transferred to the Jackson Hospital Emergency Room for further evaluation. (COR179). The nurse practitioner also ordered that certain provisions of Mr. Sumlin's medical jacket be transported with him to the local emergency room. (COR 179). At approximately 1:15 p.m., the nurse practitioner contacted the Jackson Hospital Emergency Room to notify them of the arrival of Mr. Sumlin, as well as his symptoms at the time. (COR 199).

13.   During his hospitalization, Mr. Sumlin was diagnosed as suffering from an ischemic event resulting in weakness in the left side of his body—primarily, his left arm and left leg. He was released from Jackson Hospital on July 10, 2012, to Kilby Correctional Facility ("Kilby"). Mr. Sumlin transferred from Kilby to Donaldson Correctional Facility ("Donaldson") on July 11, 2012. (COR014). Upon his return to Donaldson, Mr. Sumlin was assigned to the infirmary for observation where he received routine monitoring by the nursing staff. (COR013). The only symptom reported at the time of his arrival at Donaldson on July 11, 2012, was left sided "weakness." (COR 014).

Doc. 11-1 at 3–6 (footnote omitted).

Sumlin concedes that medical personnel examined him upon his arrival at Staton's healthcare unit care but complains that he remained in a holding cell for two to three hours, during which time he had a full stroke and his repeated requests to see the doctor were ignored.  Sumlin maintains that Dr. Copeland intentionally delayed proper medical care and treatment and exhibited deliberate indifference and a hostile attitude towards him for no reason except that he informed her that he was experiencing stroke symptoms and needed to be taken to a hospital.  Sumlin claims that even though Dr. Copeland received information from him and medical staff that a substantial risk to his health existed, Dr. Copeland did not take the information seriously and intentionally delayed access to off-site medical care, including by instructing medical staff to arrange for his transportation to the hospital by means of a prison van instead of an ambulance.[4] Docs. 17, 20, 21 & 22.

Dr. Copeland maintains that Sumlin's recollection of events is not accurate based on the information documented in his medical records.  She denies making any of the statements Sumlin attributes to her, including that she informed Sumlin he was not qualified to diagnose his condition or that she would make any decisions regarding his off-site care.  Additionally, Dr. Copeland states she was not aware of Sumlin's presence at the health care unit and did not interact with him until the nurse practitioner asked her to review his changing condition, at which time she reported to Sumlin's bedside to evaluate him. Doc. 11-1.

Ultimately, Sumlin has provided no evidence that the medical care and treatment he received from Dr. Copeland was inadequate or indicative of a disregard of a substantial risk of harm to his health and well-being.  Regarding the provision of medical care to Sumlin on July 5,

___

[4] Dr. Copeland, in her affidavit, states that the nursing staff contacted a local ambulance service to transfer Sumlin to Jackson Hospital. Doc. 11-1 at 5.  The record evidence reflects that he was transported to the hospital by a private security service. Doc. 11-7 at 21; Doc. 17 at 2; Doc. 17-2 at 1.

2012, Dr. Copeland affirms that

> to a reasonable degree of medical certainty . . . there is no medical data of any kind that suggests in any way that the passage of time from the onset of Mr. Sumlin's symptoms to the examination, diagnosis and/or provision of care to Mr. Sumlin resulted in any harm of any kind to Mr. Sumlin. First and foremost, the medical records clearly demonstrate that his symptoms were changing significantly throughout the day on July 5, 2012. There were instances when even Mr. Sumlin admits that his symptoms were decreasing. His symptoms clearly worsened after the initial nursing evaluation and then continued to decline after the evaluation by the nurse practitioner. Moreover, Mr. Sumlin did not experience some of the more common symptoms of an ischemic event of this nature. For example, I cannot find any indication where he experienced any significant trouble describing his symptoms to the medical staff or reported a loss of balance or coordination, until just before we elected to send him offsite. Therefore, as a clinician, we were required to make decisions based upon the information that was available to us at the time. Once it became clear that Mr. Sumlin was potentially experiencing some sort of ischemic event, I ensured that he received further evaluation at the local hospital. It is also important to note that I had never encountered this type of event with this particular patient and, therefore, I was required to rely upon my years of experience with other patients in order to determine the best course of action for Mr. Sumlin. Lastly, to attribute any purported delay in care to Mr. Sumlin's current medical condition (including any physical limitations) is an extraordinary leap in scientific logic. Mr. Sumlin clearly continues to experience ischemic events even since July of 2012 and I cannot identify any objective medical data suggesting in any way that anything that the Staton medical staff did or failed to do on July 5, 2012, resulted to, contributed to or otherwise exacerbated his medical condition, resulting in his current limitations.
>
> 21.  With respect to Mr. Sumlin and his complaints, I do not believe that the course of treatment provided to him or the overall level of care and medical attention provided by the medical staff at Staton has been inappropriate in any way. Likewise, I am not aware of any additional medical treatment of any kind that should have been provided to Mr. Sumlin. I have not denied and am not aware of any other member of the medical staff at Staton who denied Mr. Sumlin any necessary medical treatment or ignored any of his complaints. In fact, until the filing of this lawsuit by Mr. Sumlin, I was not aware of his complaints or concerns, which he did not raise with me during my interactions with him. Based upon my observations, the members of the medical staff at Staton examined Mr. Sumlin on a regular basis and provided the appropriate level and degree of evaluation, consultation, treatment and medications. Indeed, there is no basis for any claim by Mr. Sumlin that I ignored his complaints or otherwise failed in any way to provide him with timely and appropriate medical attention.

Doc. 11-1 at 8–9.

This court has conducted a thorough and careful review of all the evidentiary materials submitted by Dr. Copeland. From that review, the court finds that Sumlin received appropriate medical care and treatment for his medical condition on July 5, 2012. Prison medical staff did not ignore Sumlin's medical condition. Rather, they responded to his complaints, evaluated his condition, and provided care consistent with his presenting symptoms. Following the nursing staff's initial evaluation of Sumlin on his arrival to Staton's healthcare unit, Sumlin was referred to the nurse practitioner for further evaluation.[5] The nurse practitioner's examination revealed slight facial asymmetry, slight dragging of his left leg, and mild weakness to his left side but no other neurological signs or symptoms indicating that he was experiencing a stroke. After the nurse practitioner completed her examination, she conferred with Dr. Copeland, who instructed the nurse practitioner to monitor Sumlin for a brief period prior to making any final decision on the course of his treatment. Approximately twenty minutes after the nurse practitioner evaluated Sumlin, he complained to her of increased heaviness and weakness in his left arm and said that he had developed increased difficulty walking without assistance. This information was immediately communicated to Dr. Copeland who, after briefly evaluating Sumlin, took the immediate step of directing medical staff to arrange for Sumlin's transfer to the emergency room at Jackson Hospital for further evaluation.[6] Pursuant to those instructions, the nursing staff contacted correctional

_____

[5] Dr. Copeland affirms that a nurse practitioner licensed in the State of Alabama is qualified and licensed to (1) evaluate current health status and risk factors of individuals based on comprehensive health history and comprehensive physical examinations and assessments; (2) formulate a working diagnosis, develop and implement a treatment plan, evaluate and modify therapeutic regimens to promote positive patient outcomes; (3) prescribe, administer and provide therapeutic measures, tests, procedures, and drugs; (4) counsel, teach and assist individuals and families to assume responsibilities for self-care and prevention of illness, health maintenance and health restoration; and (5) consult with and refer to other healthcare providers as appropriate. Doc. 11-1 at 3–4 n.1.

[6] There is no evidence that arranging Sumlin's transport to the hospital by a prison van rather than by ambulance was done purposefully or intentionally by medical staff or in order to delay his access to medical treatment.

personnel to advise them of the physician's order for Sumlin's transfer to the emergency room at

Jackson Hospital for further medical evaluation.[7] Doc. 11-5 at 13; Doc. 11-7 at 1 & 20–21; Doc.

11-9 at 1; Doc. 17-2 at 1.

Dr. Copeland and the rest of the prison medical staff responded appropriately to Sumlin's

medical condition.  Sumlin does not have a constitutional right to specific medical treatment on

demand simply because he thinks he needs a certain procedure, nor does he have a constitutional

right to be treated by a specific doctor or another medical professional.  "Society does not expect

that prisoners will have unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9

(1992).  To the extent Sumlin's claim is based upon his own disagreement with the prison medical

staff about the course of his medical treatment, this claim does not amount to deliberate

indifference. *Estelle*, 429 U.S. at 107; *Hamm v. DeKalb Cnty.,* 774 F.2d 1567, 1575 (11th Cir.

1985) (holding that the mere fact that a prisoner desires a different mode of medical treatment does

not amount to deliberate indifference).  Whether correctional medical personnel "should have

employed additional . . . forms of treatment 'is a classic example of a matter for medical judgment'

and therefore not an appropriate basis for liability under the Eighth Amendment." *Adams v. Poag*,

61 F.3d 1537, 1545 (11th Cir. 1995) (quoting *Estelle,* 429 U.S. at 107).

Here, the court finds that Dr. Copeland's actions did not constitute deliberate indifference.

Sumlin's self-serving statements of a lack of due care and delay of necessary medical treatment

do not create a question of fact in the face of contradictory, contemporaneously created medical

records. *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010).  Sumlin offers only his

---

[7] Medical staff contacted correctional personnel by 1:45 p.m. to notify them of the physician's instructions for inmate transport to the hospital.  Because there was a shortage of correctional officers, prison personnel contacted a private security agency to arrange Sumlin's transport to Jackson Hospital.  The private security guards left Staton at approximately 2:33 p.m.  Sumlin arrived at Jackson Hospital's emergency room at 3:08 p.m. Doc. 11-9 at 1; Doc. 17-2 at 1.

bare allegations, without any supporting medical evidence, to suggest that delayed treatment exacerbated his condition. And he provides nothing more than his unsubstantiated opinions about the quality of the medical care he received. These opinions do not create a genuine dispute. Furthermore, to the extent Sumlin's allegations reflect his disagreement with the course of care he received during Dr. Copeland's assessment and treatment of his presenting symptoms on July 5, 2012, such a disagreement does not provide the framework for a federal complaint under 42 U.S.C. § 1983. *Hamm*, 774 F.2d at 1575; *Waldrop*, 871 F.2d at 1033. The record does not demonstrate that Dr. Copeland acted with deliberate indifference towards Sumlin's medical needs by intentionally delaying or withholding necessary medical treatment, or by interfering with his ability to access treatment. Moreover, Sumlin fails to present any evidence showing that Dr. Copeland knew that the manner in which she treated his condition created a substantial risk to his health or that she consciously disregarded such a risk. The record is therefore devoid of evidence—significantly probative or otherwise—showing that Dr. Copeland acted with deliberate indifference to Sumlin's serious medical needs. Summary judgment is, therefore, due to be granted in favor of Dr. Copeland.

### III.  CONCLUSION

In light of the foregoing, it is the RECOMMENDATION of the Magistrate Judge that:

1.      Defendant's motion for summary judgment (Docs. 11 & 24) be GRANTED.

2.      Judgment be GRANTED in favor of Defendant and against Plaintiff.

3.      This case be dismissed with prejudice.

It is further ORDERED that **on or before August 3, 2017**, the parties may file an objection to the Recommendation. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which a party objects. Frivolous, conclusive or general

objections will not be considered by the District Court.  This Recommendation is not a final order and, therefore, it is not appealable.

Failure to file a written objection to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE of this 20th day of July, 2017.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE